**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**
**CENTRAL ISLIP**

| | |
|---|---|
| NEW YORK REPUBLICAN STATE COMMITTEE, <br><br> <u>Nassau County Plaintiffs</u> <br> NASSAU COUNTY REPUBLICAN COMMITTEE, COUNTY OF NASSAU, TOWN OF HEMPSTEAD, TOWN OF OYSTER BAY, TOWN OF NORTH HEMPSTEAD, JENNIFER DESENA, JOHN FERRETTI, MAZI M. PILIP, LAURA A. RYDER, ELAINE PHILLIPS, <br><br> <u>Suffolk County Plaintiffs</u> <br> SUFFOLK COUNTY REPUBLICAN COMMITTEE, COUNTY OF SUFFOLK, TOWN OF BROOKHAVEN, TOWN OF ISLIP, TOWN OF RIVERHEAD, TOWN OF SMITHTOWN, TOWN OF HUNTINGTON, RAHEEM SOTO, JAROD MORRIS, LAURA ENDRES, <br><br> <u>Orange County Plaintiffs</u> <br> COUNTY OF ORANGE, STEVEN M. NEUHAUS, LEIGH J. BENTON, BARRY CHENEY, THOMAS J. FAGGIONE, PAUL RUSZKIEWICZ, KATHY STEGENGA, JANET SUTHERLAND, and PETER V. TUOHY, <br><br><div align="center">Plaintiffs,</div><br><div align="center">v.</div><br> STATE OF NEW YORK and KATHY HOCHUL, in her official capacity as Governor of the State of New York, <br><br><div align="center">Defendants.</div> | Civil Case No.: 2:25-CV-6083 <br><br><br> **ORIGINAL COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

1

**I.**
**PRELIMINARY STATEMENT**

*"Let us not seek the Republican answer or the Democratic answer but the right answer." –*

*John F. Kennedy*

1.      This lawsuit challenges the State of New York's Even Year Election Law ("EYEL") because it violates the First Amendment to the United States Constitution and Section 2 of the Voting Rights Act of 1965 ("VRA"). As the bipartisan coalition of those opposed to this law grows, so too has the group of Plaintiffs. The New York State Republican Committee, the Nassau County Republican Committee, the Suffolk County Republican Committee, candidates from the counties of Nassau, Suffolk and Orange, municipalities, and voters from those counties and elsewhere bring this action to defend their communities against a state law that suppresses local speech, increases racial polarization, and erodes democracy.

2.      For more than a century, New York has protected local self-government from the vagaries of state politics and federal overreach. The prevalence of odd-year local elections dates back to the Progressive Era—from the 1890s to 1920s when reforms addressing political corruption swept the nation. In New York, this electoral framework remained a celebrated civic institution protecting local elections from being "drowned out" by state and national control of the even-year election cycle. The EYEL upends that protection.

3.      Enacted in December 2023 by a Democrat-controlled state legislature, the EYEL forces thousands of local elections off their traditional odd-year schedules and onto crowded, even-year ballots dominated by national issues and races.  Cloaked in the rhetoric of increased "voter turnout," the law is a calculated attempt to centralize top-of-the-ticket political power at the expense of local democracy. Similar election-timing laws have been advanced in Republican-controlled states for the same purpose. Whether promoted by Democrats in New York or Republicans elsewhere, the effects on local democracy are the same.

2

4.     The EYEL violates the First Amendment because it imposes severe burdens on candidates' core political speech. By mandating the consolidation of local races onto ballots dominated by federal and state contests without the ability of political subdivisions to opt out, the EYEL deprives local candidates of a meaningful opportunity to convey their messages to voters, effectively pushing their races to the bottom of an exceedingly long ballot.

5.     The statute also violates Section 2 of the Voting Rights Act. In communities already marked by racial polarization, its framework will amplify disparities in political participation and exacerbate racially polarized voting.

6.     Numerous local officials, municipalities, representative organizations, and voters across the State are united in opposition to the EYEL. They recognize that local elections are not administrative formalities but living expressions of democracy in their communities: the town halls, municipal boards, and county legislatures where government remains personal and accountable.

7.     Plaintiffs bring this action to preserve that tradition. They seek declaratory and injunctive relief to protect the constitutional and statutory rights of candidates, and to ensure that New York's local elections remain meaningful, equitable, and free from political manipulation.

## II.

## PARTIES AND RELEVANT NONPARTIES

8.     ***Plaintiff New York Republican State Committee.*** The New York Republican State Committee is responsible for recruiting, nominating, endorsing, and supporting Republican candidates for town and county office and for communicating the Party's platform to voters throughout New York. The New York Republican State Committee sues on its own behalf and on behalf of its members and candidates.

**Nassau County Plaintiffs**

9.      ***Plaintiff Nassau County Republican Committee.*** The Nassau County Republican Committee is responsible for recruiting, nominating, endorsing, and supporting Republican candidates for town and county office and for communicating the Party's platform to voters in Nassau County. The Nassau County Republican Committee sues on its own behalf and on behalf of its members and candidates.

10.     ***Plaintiff County of Nassau.*** The County of Nassau is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

11.     ***Plaintiff Town of Hempstead***. The Town of Hempstead is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

12.     ***Plaintiff Town of Oyster Bay***. The Town of Oyster Bay is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

13.     ***Plaintiff Town of North Hempstead***. The Town of North Hempstead is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

14.     ***Plaintiff Jennifer DeSena — Town Supervisor.*** DeSena is the Supervisor of the Town of North Hempstead. She was first elected to the position in November 2021, was re-elected in 2023, and will seek reelection for a third term of office in November 2025.

15.     ***Plaintiff John Ferretti — Town Supervisor.*** Ferretti is the Supervisor of the Town of Hempstead. He was sworn in on August 5, 2025, following the resignation of the former Supervisor, and will seek election to a full term in November 2025. Ferretti previously served four consecutive terms on the Nassau County Legislature as well as the Chief Deputy County Clerk of Nassau County.

16.     ***Plaintiff Elaine Phillips — County Comptroller.*** Phillips is the Comptroller of Nassau County. Elected in November 2021, she assumed office in January 2022 and will seek re-election

in November 2025. Phillips previously served as Mayor of the Village of Flower Hill and as New York State Senator for the 7th District.

17.     ***Plaintiff Mazi M. Pilip — County Legislator.*** Pilip serves as a Legislator for Nassau County District 10. First elected in 2021 and re-elected in 2023, Pilip is seeking re-election in 2025. Pilip was also a candidate in the February 2024 special election for the U.S. House of Representatives.

18.     ***Plaintiff Laura A. Ryder — Town Councilmembe*r.** Ryder serves on the Board of the Town of Hempstead, representing the 4th Councilmanic District. Appointed in March 2023 to fill a vacancy, she will stand for election in November 2025. Ryder previously served as a trustee on the Lynbrook Village Board for two years.

**Suffolk County Plaintiffs**

19.     ***Plaintiff Suffolk County Republican Committee.*** The Suffolk County Republican Committee (together with the New York Republican State Committee and Nassau County Republican Committee, "**Party Plaintiffs**") is responsible for recruiting, nominating, endorsing, and supporting Republican candidates for town and county office and for communicating the Party's platform to voters in Suffolk County. The Suffolk County Republican Committee sues on its own behalf and on behalf of its members and candidates.

20.     ***Plaintiff County of Suffolk***. The County of Suffolk is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

21.     ***Plaintiff Town of Brookhaven***. The Town of Brookhaven is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

22.     ***Plaintiff Town of Islip***. The Town of Islip is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

23.     ***Plaintiff Town of Riverhead***. The Town of Riverhead is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

24.     ***Plaintiff Town of Smithtown***. The Town of Smithtown is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

25.     ***Plaintiff Town of Huntington***. The Town of Huntington is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

26.     ***Plaintiff Raheem Soto — Candidate for Suffolk County Legislature.*** Soto is a candidate for the Suffolk County Legislature, 2nd District, in the November 2025 election. Soto is the publisher of the Messenger Papers newspaper chain based in Suffolk County. Soto is making his first run for office.

27.     ***Plaintiff Jarod Morris — Candidate for Suffolk County Legislature.*** Morris is a candidate for the Suffolk County Legislature, 15th District, in the November 2025 election. Morris, a neighborhood aide in the Suffolk County Executive's office, is a trustee and former president of the Board of Education of the Wyandanch Union Free School District. Morris is a registered voter residing in New York and a member of a racial minority protected under the VRA.

28.     ***Plaintiff Laura Endres — Candidate for Suffolk County Legislature.*** Endres is a candidate for the Suffolk County Legislature, 5th District, in the November 2025 election. An attorney and community advocate, she is making her first run for public office.

**Orange County Plaintiffs**

29.     ***Plaintiff Orange County***. Orange County (together with the Counties of Nassau and Suffolk, and the Towns of Hempstead, Oyster Bay, North Hempstead, Brookhaven, Islip, Huntington, Riverhead, and Smithtown, the "**Municipal Plaintiffs**") is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

30.     ***Plaintiff Steven M. Neuhaus — County Executive of Orange County.*** Neuhaus currently serves as County Executive. He was first elected in 2013 and will seek re-election to a fourth term in November 2025. Prior to serving as County Executive, Neuhaus was the Supervisor of the Town of Chester for six years.

31.     ***Plaintiff Leigh J. Benton — County Legislator.*** Benton serves as a Legislator in the Orange County Legislature, representing the 16th District. He is the current Majority Leader of the Orange County Legislature. Benton has served multiple terms and will seek re-election in November 2025.

32.     ***Plaintiff Barry J. Cheney — County Legislator.*** Cheney serves as a Legislator in the Orange County Legislature, representing the 8th District. First elected in 2013, Cheney has served multiple terms and will seek re-election in November 2025.

33.     ***Plaintiff Thomas J. Faggione — County Legislator.*** Faggione serves as a Legislator in the Orange County Legislature, representing the 13th District. First appointed as a temporary replacement to the vacant seat in 2015, Faggione won in a race for the office later the same year. He will seek re-election in November 2025.

34.     ***Plaintiff Paul Ruszkiewicz — County Legislator.*** Ruszkiewicz serves as a Legislator in the Orange County Legislature, representing the 3rd District. Ruszkiewicz has served multiple terms since his election in 2013 and will seek re-election in November 2025.

35.     ***Plaintiff Kathy Stegenga — County Legislator.*** Stegenga serves as a Legislator in the Orange County Legislature, representing the 11th District. Elected in 2017, she will seek re-election in November 2025.

36.     ***Plaintiff Janet Sutherland — County Legislator.*** Sutherland serves as a Legislator in the Orange County Legislature, representing the 2nd District. First elected in 2017, she will seek re-election in November 2025.

37.     ***Plaintiff Peter V. Tuohy — County Legislator.*** Tuohy (together with Ferretti, Pilip, Soto, Morris, Endres, Ryder, Phillips, Neuhaus, Benton, Cheney, Faggione, Ruszkiewicz, Stegenga, and Sutherland, the "**Candidate Plaintiffs**") serves as a Legislator in the Orange County Legislature, representing the 7th District. Elected in 2017, he will seek re-election in November 2025.

**Defendants**

38.     Defendant State of New York is the enacting jurisdiction for the EYEL.

39.     Defendant Kathy Hochul is the Governor of the State of New York, sued in her official capacity.

## III.

## JURISDICTION AND VENUE

40.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a) because this case arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

41.     This Court has the authority to grant declaratory relief under 28 U.S.C. § 2201 and injunctive relief under 28 U.S.C. § 2202.

42.     Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred within this District, including the adoption, administration, and anticipated enforcement of the EYEL with respect to Plaintiffs in Nassau and Suffolk Counties. Defendants are subject to personal jurisdiction in this District because they implement and enforce the EYEL in this jurisdiction.

43.     This Court has authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) and 52 U.S.C. § 10310(e).

## IV.
## FACTUAL BACKGROUND

### A.  Local Elections in Odd Years Are a Celebrated Civic Institution

44.     For more than a century, New York's local elections have occurred in odd years and stood as a hallmark of civic engagement. Born in the Progressive Era of the late 1800's, reformers directed their efforts to shield local democracy from political corruption. Thus, nineteenth century reformers sought to liberate local politics from the grip of the state and national party machines that dominated the political order of that time.



"THAT'S WHAT'S THE MATTER."

Boss Tweed. "As long as I count the Votes, what are you going to do about it? say?" [1]

45.     At New York's 1894 Constitutional Convention, delegates deliberately separated municipal and county elections from federal and statewide contests. Their goal was to preserve a forum where community issues, not national partisanship, could be debated on their own terms.

46.     These reforms reflected a simple but profound insight: local government is where citizens most directly experience and shape their communities through our democracy. Not only in New York, but nationally, progressive reformers also viewed local elections held in odd years ("off-cycle elections") as a safeguard against corruption and voter manipulation.

47.     Mayors, town supervisors, county executives, legislators, and comptrollers campaigned directly on issues that mattered to their constituents. Importantly, they were not required to compete for attention or align their political platforms with the more powerful candidates vying in the presidential or gubernatorial contests.

48.     Off-cycle elections embody the First Amendment's animating values. Elections held in odd years provide local candidates and voters a meaningful opportunity to exchange ideas, debate local issues, and

---

[1] From Harper's Weekly, October 7, 1871, page 944.

hold officials accountable. The timing of these elections was not a mere administrative detail, but a choice aimed at protecting the marketplace of ideas and democracy at the local level.

**B.  Tammany Hall Redux: Albany's Attempt to Consolidate Power through the EYEL**

49.    In December 2023, the New York Legislature enacted Chapter 741 of the Laws of 2023, known as the Even Year Election Law, or EYEL. The EYEL was presented as an effort to "increase voter participation" by consolidating local, state, and federal elections in a single day on a single ballot. In practice, the statute will force nearly all local elections off odd-year schedules and onto crowded even-year ballots dominated by federal and statewide races.

50.    Local leaders across New York warned that the EYEL would drown out local voices and undermine community debate. Nevertheless, the bill was introduced near the end of the legislative session by those aligned with Governor Hochul and others focused on national and state-wide issues. The bill advanced without meaningful committee deliberation or public hearings.

51.    For most academics, demographers, political historians, good-government experts, and many First Amendment advocates, the bill was seen as a "disaster." Few were surprised when the bill received bipartisan opposition from many local officials throughout the state, as well as groups like the New York Association of Towns.[2] The New York State Association of Counties, comprised of Democratic and Republican County Executives representing all 57 counties outside New York City, formally urged the Governor to veto the bill, warning that the law would drown out local issues and undermine "debate[] and discuss[ion] in the local sphere."[3]

---

[2] Notably, because elections in the City of New York are governed by the New York Constitution, they are not affected by the EYEL. On Tuesday, November 4, 2025, New York City voters will consider a ballot initiative proposing the adoption of even-year election voting for city offices. Even in this context, there has been substantial opposition. *See* Errol Louis, *Why New York Should Keep Its Elections Off-Year*, N.Y. Mag.: Intelligencer (2025), https://nymag.com/intelligencer/article/why-new-york-city-should-keep-off-year-elections.html.

[3] New York State Association of Counties, Resolution No. 1, 2023 Fall Seminar Standing Committee on Intergovernmental Affairs: Resolution Encouraging Governor Kathy Hochul to Veto Legislation Requiring that Local Elections be Held in Even-Numbered Years (2023), https://www.nysac.org/media/31hbhsge/23-inter-gov-regulations-reso-1.pdf.

52.    Likewise, in a July 2023 letter urging Governor Kathy Hochul to veto the EYEL legislation, New York State Board of Elections Commissioner Anthony J. Casale and New York State Board of Elections Co-Chair Peter S. Kosinski wrote, "We believe this is an ill-advised effort that will diminish the attention paid to local office elections while not meaningfully increasing voter participation."[4]

53.    Those concerns were ignored. On December 22, 2023, Governor Kathy Hochul signed the bill into law. The EYEL is set to govern the November 2025 election cycle and beyond.



54.    The EYEL moves the election of nearly all county and town offices to even-numbered years to coincide with the November general elections for state and federal offices. It also amends Municipal Home Rule Law § 34(3) to prohibit any county charter or local law from superseding this new statewide requirement.

55.    The statute provides that the first affected elections will occur in November 2025, after which all subsequent elections for affected offices will be held in even-numbered years. To align the calendar,

---

[4] New York State Board of Elections, *Letter to Elizabeth Fine, Acting Counsel to the Governor, Re: Assembly Bill 4282-B / Senate Bill 3505-B (Recommendation: Veto)* (July 19, 2023), available at https://www.nysac.org/media/bj5dq2um/state-election-commissioners-letter-against-even-year-local-elections-bill.pdf

the law shortens certain terms of office so that incumbents elected in 2025 will serve one- or three-year transitional terms before the next election cycle.

56.     The law covers a broad array of local offices outside of New York City, including: County Executives and County Legislators, County Comptrollers and Treasurers, Town Supervisors, Town Board Members, Town Clerks, and Highway Superintendents; as well as numerous municipal and special-district offices whose elections had previously occurred in odd years. Some positions, such as Sheriffs, County Clerks, and Surrogate Judges, are exempted because their terms are fixed in the State Constitution or because they serve three-year terms.[5]

57.     The EYEL's effects are sweeping. It consolidates thousands of local races onto the same ballots as presidential, gubernatorial, and congressional contests. This mass consolidation will erase the temporal and communicative space that sustains local democratic dialogue.

58.     In Nassau County, elections for County Executives, County Comptroller, County Legislators, and numerous town offices—including those in Hempstead, Oyster Bay, and North Hempstead—will move from odd to even years after the election of 2025. Plaintiffs Elaine Phillips, John R. Ferretti, Laura A. Ryder, and Mazi M. Pilip will each be adversely affected by the law.

59.     In Suffolk County, the EYEL directly affects town and county elections in Brookhaven, Islip, Riverhead, Smithtown, Huntington, and other municipalities. Candidates such as Raheem Soto, Jarod Morris, and Laura M. Endres, each seeking seats in the Suffolk County Legislature in 2025, will run in a landscape fundamentally and detrimentally transformed by the EYEL.

60.     In Orange County, the EYEL likewise affects contests for County Executive and the County Legislature. Plaintiffs Steven M. Neuhaus, Leigh J. Benton, Barry J. Cheney, Thomas J. Faggione, Paul Ruszkiewicz, Kathy Stegenga, Janet Sutherland, and Peter V. Tuohy—each of whom currently serves

---

[5] While proponents assert broad claims of increased voter turnout, it is important to note that approximately 40% of the citizen voting-age population—those residing in New York City—will not be impacted at all. U.S. Census Bureau, *Citizen Voting Age Population (CVAP) Special Tabulation from the 2019–2023 American Community Survey 5-Year Estimates*, https://www.census.gov/programs-surveys/decennial-census/about/voting-rights/cvap.html.

or is seeking election to Orange County offices—will see their election cycles negatively altered and their campaigns conducted under the new electoral framework.

### C. **Drowning Democracy: The EYEL Imposes Severe Burdens on Political Speech and Association**

61.    Adopted without any opportunity for any County or political subdivision to opt out, the EYEL imposes severe burdens on core political speech and association in local elections. By forcing local elections onto ballots dominated by federal and state contests, the EYEL submerges municipal voices beneath the noise of national politics, depriving candidates and voters alike of the local public fora that have long sustained civic dialogue in New York.

#### i. Lost Messages: Visibility & Cost of Speech

62.    Local candidates now must compete for visibility, media access, and fundraising against national campaigns that saturate television, radio, social media, and mail. Campaign costs for local candidates will rise prohibitively as they seek to reach voters in an information environment dominated by presidential and congressional races, effectively depriving candidates for local offices from meaningful political communication. Put simply: local candidates will not be able to compete in that landscape.[6]

63.    Because local contests will receive minimal media or civic attention during even-year cycles, candidates will lose traditional, low-cost avenues of communication—such as letters to local papers, town-hall meetings, neighborhood debates, and earned coverage that currently sustains municipal discourse. National campaigns will dominate press cycles and crowd out community-level debate, leaving local issues invisible in the broader political conversation.[7]

---

[6] Daniel Konstantinovic, *Election Ad Spending Caused Prices to Surge, Forcing Brands Elsewhere*, eMarketer (Nov. 1, 2024), https://www.emarketer.com/content/election-ad-spending-caused-cpm-surge.
[7] Charles Angelucci, Julia Cage & Michael Sinkinson, *Media Competition and News Diets*, 16(2) Am. Econ. J.: Microecon. 62 (2024).

64. Empirical data confirms this disparity in visibility, as political advertising revenue for the five largest publicly held local television station groups skyrockets in even-numbered years, demonstrating how national races consume the marketplace for voter attention.[8]



Political advertising revenue at local TV companies
Total political advertising revenue for five publicly held local TV station companies (in U.S. dollars)

65. Faced with an advertising environment inflated by billions of dollars in national spending, local candidates will not be able to compete—an "unnecessary gag" on local speech that transforms their campaigns into mere footnotes on overcrowded ballot.

### ii. Distorted Messages: Content & Information Effects

66. In fact, virtually all voting and election scientists agree that the EYEL will nationalize local elections. Voters, deprived of sustained engagement with local issues, will increasingly rely on party labels, top-of-the-ticket cues, and prejudices rather than substantive evaluation of local candidates. Collectively, the EYEL will transform local elections from deliberative exercises in community self-

---

[8] Christopher Aubsin & Sarah Naseer, *Local TV News Fact Sheet*, Pew Research Center (Sept. 14, 2023), https://www.pewresearch.org/journalism/fact-sheet/local-tv-news.

government into reflexive expressions of national partisanship and prejudice, undermining the purpose of the First Amendment and its protection of political debate.

67.    For example, one recent survey found that "4 in 10 respondents…prioritize[ed] local issues…over partisan affiliation."[9] However, beginning in 2026, the EYEL will ensure that national (or statewide) concerns will eclipse local priorities, eroding the informational environment necessary for issue-based local voting. A Newspaper Research Journal study reached the same conclusion: "[i]n an electoral environment increasingly saturated by national affairs, voters are likely to think federally, but fail to act locally."[10]

68.    Similarly, it is universally accepted that long, crowded ballots (typical of even-year elections) increase the number of voters who will rely on confirmation bias that undermines electoral accountability.[11] As information quality drops, voters default to cues, weakening the feedback loop between local performance and voter judgment.

### iii. Biased Voting & Stereotypes

69.    Low-information environments increase reliance on heuristics, including partisan, racial, and gender stereotypes. Numerous studies have concluded that many voters are unable to acquire information about down-ballot contests until they go to the polls. Voters who never obtain such information in these circumstances will rely heavily on partisan prejudices.

70.    Not only does a low-information election increase reliance on partisan affiliations, it increases voters' reliance on demographic heuristics, particularly race and gender stereotypes. Empirical research confirms this phenomenon: in low-information elections, voters rely on stereotypes.

---

[9] Edward L. Lascher, Jr., Brian Adams & Danielle Martin, *Local Elections Are Less Partisan Because Voters Will Cross Party Lines When Issues Hit Close to Home*, The Fulcrum (Aug. 21, 2024), https://thefulcrum.us/bipartisanship/partisanship-in-local-elections.
[10] Christopher Chapp & Peter Aehl, *Newspapers and Political Participation: The Relationship Between Ballot Rolloff and Local Newspaper Circulation*, 42(2) Newspaper Res. J. 235, 250 (2021).
[11] *See, e.g.,* Lockwood, Ben, "Confirmation Bias and Electoral Accountability," Centre for Economic Policy Research (Jan. 12, 2017).

71.    In sum, when candidate information is limited, as is the case when elections are clustered together, voters often make assumptions based on the race, ethnicity, and gender of the candidates.[12]

72.    These predictable biases are not abstract. They surface when ballots are long and information is thin—precisely the environment the EYEL creates.

### iv. Evidence from Other Jurisdictions

73.    Experience from other states confirms these harms. In jurisdictions such as California and Nevada, where laws similar to the EYEL were implemented, down-ballot drop off demonstrates reduced engagement with local issues.[13] More broadly, empirical data shows that consolidating elections on even years greatly exacerbates incumbency advantage, resulting in fewer competitive municipal races and weakened governmental accountability.[14] These are exactly the speech and association harms described above.

74.    In Indiana, locals voiced opposition to proposed changes advanced by Republican lawmakers that would move local elections to even-numbered years and require all counties to adopt vote centers.[15] Critics argue persuasively that the proposed changes would erode local control, create constitutional conflicts, and bury community races beneath federal contests. Indiana Democratic Party Chair Karen Tallian noted that small towns already have the option to align their elections and urged the state not to impose the shift on larger municipalities.

### v. Constitutional Synthesis

75.    By erasing the temporal and communicative space that makes local democracy thrive, the EYEL imposes a direct and substantial burden on core political speech and association under the First

---

[12] Melody Crowder-Meyer, Shana Kushner Gadarian & Jessica Trounstine, *Voting Can Be Hard, Information Helps*, 56(1) Urban Affs. Rev. 124 (2019).

[13] Ricardo Torres-Cortez, *Seaman, Berkley Say Getting Voters in Downballot Mayor Race is a Challenge*, Las Vegas Rev.-J. (Nov. 2, 2024), https://www.reviewjournal.com/news/politics-and-government/las-vegas/seaman-berkley-leaning-on-bipartisan-bona-fides-for-nonpartisan-race-3205253/.

[14] Justin de Benedictis-Kessner, *Off-Cycle and Out of Office: Election Timing and the Incumbency Advantage*, 80 J.Pol. 119 (2018).

[15] Ind. Pub. L. No. 108-2025 (H. Enrolled Act 1633) (Apr. 22, 2025).

Amendment—not merely by raising costs, but by degrading visibility, distorting content, and increasing bias in the act of voting. This burden cannot be justified by generalized appeals to convenience where less restrictive alternatives (e.g., voter information programs, voter participation outreach) exist to increase participation without nationalizing local elections.[16]

### vi. Burdens on the Candidate Plaintiffs

76.    These harms are not theoretical. The EYEL will result in tangible, real-world harms to Candidate Plaintiffs' ability to reach their constituents.[17]

77.    Nassau County Candidate Plaintiffs Ferretti, Pilip, Ryder, and Phillips will be harmed because their contests will be moved onto even-year ballots dominated by statewide and federal races. That change will suppress their core political speech and impede their ability to associate with likeminded voters, diminish visibility for town- and county-level issues, and materially burden their ability to communicate with, and organize, voters.

78.    Likewise, Suffolk County Candidate Plaintiffs Soto, Morris, and Endres will face consolidation onto high-salience, even-year ballots—forcing their campaigns into an environment saturated by national messaging, inflating the cost of reaching voters, and impeding their ability to engage in political expression and association focused on county issues.

79.    The Orange County Candidate Plaintiffs—Benton, Cheney, Faggione, Ruszkiewicz, Stegenga, Sutherland, and Tuohy—will likewise be directly burdened by the EYEL. Their ability to engage constituents on local concerns will be overwhelmed by state and national political discourse.

### D.  **The EYEL Disproportionately Affects Minority Voters and Worsens Racial Polarization**

80.    Section 2(a) of the Voting Rights Act provides that "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political

---

[16] The First Amendment is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

[17] Increasing the number of voters is not the primary goal of the First Amendment especially when these voters are uninformed and uninterested in local debate.

subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."[18]

81.    Section 2(b) further provides that "A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[19]

82.    The Supreme Court recognizes that Section 2 protects against more than outright barriers to voting but also practices that interact with historical and social conditions to diminish minority voters' ability to participate equally in the political process.[20]

83.    More recently, the Court reaffirmed that the "essence of a § 2 claim" is "that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities" of minority and non-minority voters to elect their preferred representatives.[21]

84.    The Supreme Court's Section 2 analysis recognizes that claims may be prospective and assessed in the context of how a challenged practice is likely to interact with real-world conditions and history.[22]

85.    New York's newly enacted Even Year Election Law constitutes such a discriminatory practice. By requiring local elections, including county, municipal and town offices, to be consolidated into even-numbered years with federal and statewide elections, the EYEL dramatically alters the electoral landscape in a manner that disproportionately burdens minority voters.

86.    For decades before *Shelby County v. Holder*, 570 U.S. 529 (2013), many parts of New York were covered jurisdictions under the Section 5 preclearance regime, requiring federal approval before

---

[18] 52 U.S.C. § 10301(a).
[19] 52 U.S.C. § 10301(b).
[20] *Thornburg v. Gingles*, 478 U.S. 30 (1986).
[21] *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 660 (2021) (citing *Gingles*).
[22] *See, e.g., Gingles; Brnovich; Allen v. Milligan*, 599 U.S. 1 (2023).

election changes took effect. That preclearance regime ended with *Shelby County*, removing an ex ante check on changes like the EYEL.

87.     On June 20, 2022, New York adopted the John R. Lewis Voting Rights Act, including a preclearance regime for covered localities: an acknowledgment by the State that local election-law changes can burden minority voters and often warrant advance review.

88.     Federal courts in this circuit frequently find Section 2 violations in New York localities, reflecting enduring racially polarized voting and structural barriers.[23]

89.     Consolidating local races onto high-salience even-year ballots will predictably submerge local contests beneath federal and statewide campaigns, lengthen ballots, and increase down-ballot roll off, with voters casting votes for top-of-ticket offices but skipping local races. Political science literature confirms, without meaningful contrary support, that even when overall turnout rises in on-cycle "even-year" elections, roll-off occurs and will typically be uneven across communities, affecting who elects local officials. Worse, the EYEL will exacerbate patterns in polarized voting across racial lines.

90.     The EYEL represents a statewide departure from New York's long-standing odd-year local election schedules, precisely the kind of departure from standard practice that *Brnovich* flags for review when it burdens minority voters given the jurisdiction's history.

91.     Although New York claims the EYEL will increase participation, that objective can be accomplished by means that do not carry foreseeable, disparate costs for minority communities. Assessments of the impacts of ballot length, voter-information access, and administrative capacity demonstrate that the EYEL's means are tenuous and pretextual.

92.     The EYEL is operative beginning with the November 2025 election cycle. Without relief, Plaintiffs will vote in elections with intensified racially polarized voting, denying minority voters,

---

[23] *See, e.g., Goosby v. Town Bd. of Town of Hempstead*, 180 F.3d 476 (2nd Cir. 1999); *Clerveaux v. East Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2nd Cir. 2021).

particularly in political subdivisions with at-large voting systems, an equal opportunity "to elect representatives of their choice."[24]

### i. Disproportionate Impact on Racial Minorities

93.    Studies uniformly show that changing local election timing dramatically alters the electorate's composition. Moving elections on-cycle changes who votes in local races and can shift outcomes when roll-off and information costs are uneven.

94.    A recent Cambridge University study found that in elections with multiple concurrent elections (i.e., local and federal), selective abstention (i.e., roll-off) is significant and is influenced by how salient lower-level races appear.[25]

95.    Moreover, detailed reviews of local election reforms repeatedly show that although election consolidation *can* improve turnout, the increased ballot length results in "ballot drop-off"—meaning lower-visibility local races lost votes. In fact, empirical research illustrates that election consolidation does not guarantee increased participation in all races, rather, it redistributes participation.

96.    Empirical studies further show that consolidating local elections into even-year cycles produces longer ballots and higher rates of "roll-off," where voters cast ballots for top-of-ticket races but skip local contests, increase voter fatigue and blank responses in down-ballot races. More recent work by Chapp & Aehl links higher local-newspaper circulation to reduced roll-off,[26] while MIT Sloan reports that the decline of local news and rise of nationalized information diets has made voters more likely to vote a single party line across all races.[27] In even-year elections dominated by national coverage, voters

---

[24] 52 U.S.C. § 10301(b); In an electoral context, "at large" is defined as "[t]he whole membership or population (notably a city, county, state, province, nation, club or association), rather than a subset." U.S. Election Assistance Comm'n, Glossary of Election Terms 8 (Rev. Ed. 2009).
[25] Reto Foellmi, Rino Heim & Lukas Schmid, *Voter Turnout and Selective Abstention in Concurrent Votes*, 2025 Pol. Sci. Res. & Methods 1, 1–20 (Cambridge Univ. Press), https://doi.org/10.1017/psrm.2025.10033.
[26] Christopher Chapp & Peter Aehl, *Newspapers and Political Participation: The Relationship Between Ballot Rolloff and Local Newspaper Circulation*, 42 Newspaper Res. J. 235 (2021).
[27] Charles Angelucci, Julia Cage & Michael Sinkinson, *Media Competition and News Diets*, 16(2) Am. Econ. J.: Microecon. 62 (2024).

receive <u>less information</u> about local candidates, leading to greater abstention and reliance on partisan cues.[28]

97.    In New York, the EYEL will place many additional local races on already lengthy even-year ballots and heighten information-access concerns for voters who face higher costs to acquire information regarding local races.

98.    Federal Courts weigh a variety of socio-economic factors—including education, median income and housing—to consider the increase in the cost of participation in the political process. Public Census and ACS data show persistent race-based gaps in New York in educational attainment.[29] Furthermore, the 2025 New York State Annual Poverty Report shows similar race-based gaps in poverty levels throughout the state.[30]

99.    The EYEL's shift to even-year ballots will exacerbate roll-off and informational burdens in the minority communities that already face higher costs of participation. As New York cases reveal, minority-preferred candidates are vulnerable to structural changes that alter electorates or depress down-ballot completion.[31]

### ii. Increased Polarization Across Racial Lines

100.    The shifts in electorate composition engendered by the EYEL will amplify existing patterns of racially polarized voting. Consolidating local elections into even-year cycles brings into the electorate a larger share of voters who are less informed about local issues and more likely to vote along partisan and racial lines.

---

[28] *Id.*

[29] U.S. Census Bureau, American Community Survey (ACS) 1-Year Estimates, 2023, accessed via Census API: https://www.census.gov/data/developers/data-sets/acs-1year.html.

[30] New York State Community Action Association, *2025 New York State Annual Poverty Report* (2025), available at https://nyscaa.memberclicks.net/assets/docs/PovReport2025/2025%20NYS%20Poverty%20Report.pdf.

[31] *See, e.g., Goosby; East Ramapo*.

21

101.    Studies confirm that in low-information elections, voters rely on stereotypes, leading them to assume that female candidates are more liberal and honest and Black candidates are more focused on minority rights. This leads to voters "rely[ing] heavily on the partisan heuristic."[32]

102.    Empirical studies from jurisdictions that have adopted even-year election laws confirm exacerbated racially-polarized voting which results in minority-preferred candidates losing ground when local races are submerged in statewide and federal elections. The EYEL thus interacts with New York's already documented racial polarization to magnify disparities in minority political influence.

103.    Research shows that the increasing nationalization of U.S. elections has synchronized voter behavior across federal, state, and local levels, thereby undermining the localized, cross-racial coalitions that once characterized municipal politics. Abramowitz & Webster document that "negative partisanship" (voting motivated by animosity toward the opposing party) has spread uniform partisan voting patterns to all levels of government.[33] Likewise, a Fulcrum study found that roughly 40% of voters will cross party lines in local races only when local issues are salient;[34] in even-year contexts dominated by national narratives, that issue salience disappears. This convergence means that minority-preferred or nonpartisan local candidates (those who often rely on cross-party and neighborhood-based support) are especially disadvantaged when their races are submerged beneath high-salience federal contests.

### iii. Potential Challenges Under the New York Voting Rights Act

104.    At the same time, the EYEL destabilizes the equilibrium of numerous local at-large election systems that currently operate equitably under odd-year schedules where candidates are able to overcome prejudices with information. Placing those systems on even-year ballots dominated by

---

[32] Brian F. Schaffner & Matthew J. Streb, *The Partisan Heuristic in Low-Information Elections*, 66 Pub. Op. Q. 559, 561 (2002).
[33] Alan I. Abramowitz & Steven Webster, *The Rise of Negative Partisanship and the Nationalization of U.S. Elections in the 21st Century*, 41 Electoral Stud. 12 (2016).
[34] Edward L. Lascher Jr., Brian Adams & Danielle Martin, *Local Elections Are Less Partisan Because Voters Will Cross Party Lines When Issues Hit Close to Home*, The Fulcrum (Aug. 21, 2024).

statewide and federal races will render many at-large structures newly susceptible to vote dilution claims under Section 2 of the Voting Rights Act and the John R. Lewis Voting Rights Act of New York.

### iv. Voting Rights Act Harms Affecting Plaintiffs

105.    Plaintiff Jarod Morris is a minority voter who resides and votes in Wyandanch, a hamlet located within the Town of Babylon in Suffolk County, New York. The Town of Babylon is one of many local New York jurisdictions whose local elections New York State has shifted from odd-numbered years to even-numbered years with the EYEL. The EYEL applies to Plaintiff's jurisdiction beginning with the November 2025 election cycle.

106.    By consolidating local contests with federal and statewide elections, the EYEL submerges local candidates beneath partisan and racial voting patterns that do not reflect local coalitions. Minority-preferred candidates who succeed in low-salience, issue-based local elections will face reduced visibility and increased racially polarized voting, resulting in minority voters losing the ability to elect candidates of their choosing, an outcome Section 2 squarely forbids.

107.    Plaintiff Morris's Town of Babylon conducted local elections under its at-large system on odd years for more than a century. By holding odd-year elections, away from the fray of statewide and national debate, Babylon has achieved a diverse town council reflective of the community because of locally focused debate.

108.    The current Town of Babylon Council comprises two white, one Hispanic and one African American. This diversity mirrors the community, whose population is 50% white, 28% Hispanic and 14% African American. Notably, the Town of Babylon achieved this reflective diversity even though 2019-2023 5-year ACS data shows white voters comprise 61% of the Citizen Voting Age Population (CVAP).

109.    Plaintiff Morris, as a Babylon minority voter, will see the effectiveness of his vote diminished when local elections merge into even-year cycles that amplify majority bloc voting and bias.

110.    The Town of Shelter Island provides another example of an at-large electoral system leading to diverse representation.

111.    The current Town of Shelter Island Council comprises three white and one African American. Shelter Island has a diverse Council under the at-large system notwithstanding the fact that the community in Shelter Island is 87% white CVAP and only 1% African American CVAP. In fact, the African American Councilmember is also the lone Republican of the four members of the Council, elected to the position even though Shelter Island has far more Democratic registered voters (45%) than Republican registered voters (22%).

112.    Vibrant local debate works. Odd-year elections, which allow voters to evaluate the candidates and their positions on local issues rather than voting on heuristics and bias, allow these at-large electoral systems to succeed.

113.    The EYEL thus not only denies minority voters equal access to the political process but also increases the likelihood that New York's at-large systems will be subject to liability—a foreseeable and compounding consequence of the State's misguided policy choice.

114.    The EYEL will engender measurable racial disparities in down-ballot completion and candidate visibility once local contests are submerged beneath statewide and federal races, yet less discriminatory alternatives exist to increase participation in local elections without restructuring when local races occur: targeted outreach, enhanced voter information, and increased resources.

115.    In short, the EYEL transforms functioning, inclusive at-large systems into vehicles of exclusion—an outcome Congress and New York law alike forbid.

**V.**
**CAUSES OF ACTION**

**Count One: Violation of the First and Fourteenth Amendment Rights and Pursuant to 42 U.S.C. § 1983**

116.    Plaintiffs incorporate the paragraphs above as though copied verbatim herein.

117.    The First Amendment protects the right of candidates to engage in uninhibited, robust, and wide-open political debate and the right of voters to receive information essential to informed electoral choice.[35]

118.    The EYEL imposes an unconstitutional and severe burden on those rights by suppressing local candidate speech. By mandating that county and town elections occur simultaneously with federal and statewide contests, the EYEL forces local candidates to compete for public attention, media access, and fundraising bandwidth against national races that dominate the airwaves and absorb limited civic resources.

119.    The result is not an expansion of democratic participation but a drowning-out of local voices. Under the EYEL, candidates for local office cannot meaningfully reach voters or debate local issues in their communities. Local campaigns are drowned out by federal partisanship, leaving candidates unable to disseminate their messages to voters.

120.    The principal goal of the First Amendment is not to superficially increase the number of voters that turn out to the ballot box. As the Court noted in *Anderson*, "the primary values protected by the First Amendment – a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open – are served when election campaigns are not monopolized by the existing political parties."[36]

121.    This suppression of speech is amplified by the law's tangible, practical economic burdens. As documented time and again in election studies, campaign costs rise sharply in even-year cycles, when

---

[35] *Anderson*, 460 U.S. at 780.
[36] *Id* at 794.

25

advertising markets are saturated by national campaigns. Local candidates must pay inflated rates or forgo speech altogether. The law therefore conditions meaningful political expression on access to large sums of money, violating the core First Amendment prohibition on laws that penalize or chill speech through financial burdens.

122.    By coupling local elections to federal and statewide ballots, the EYEL systematically converts local races into low-information, partisan contests. Voters default to party heuristics and identity prejudices, rather than candidate speech. This erases the "town square" the First Amendment was designed to protect.

123.    The State's asserted interest in administrative efficiency or voter convenience cannot justify this wholesale suppression of speech. Even if those interests were legitimate, the EYEL is not narrowly tailored. Less-restrictive alternatives, such as state-funded voter education, could achieve the same ends without erasing the forum for local discourse.

124.    Accordingly, the EYEL unconstitutionally burdens the speech, expressive association, and petition rights of local candidates and their voters, in violation of the First Amendment.

### Count Two: Violation of Section 2 of the Federal Voting Rights Act, 52 U.S.C. § 10301

125.    Plaintiffs incorporate the paragraphs above as though copied verbatim herein.

126.    Section 2 of the Voting Rights Act provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen to vote on account of race or color."[37]

127.    African Americans in New York have suffered from, and continue to suffer from, discrimination based on race. The ongoing effects of this discrimination include significant and continuing socioeconomic disparities between African Americans and whites in New York.

---

[37] 52 U.S.C. § 10301(a).

128.    Under the totality of the circumstances, the interaction of the New York Even Year Election Law with the effects of discrimination against African Americans in New York will cause African Americans to have less opportunity to meaningfully participate in the political process and to elect representatives of their choice.

129.    Accordingly, the New York Even Year Election Law violates Section 2 of the Voting Rights Act.

### Count Three: Injunctive Relief

130.    Plaintiffs incorporate the paragraphs above as though copied verbatim herein.

131.    As alleged in Counts One and Two, the EYEL violates the First Amendment and Section 2 of the Voting Rights Act.

132.    Under *Ex parte Young*, 209 U.S. 123 (1908), and the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal courts may enjoin state officials from enforcing or compelling compliance with state laws that conflict with federal constitutional and statutory guarantees.

133.    Absent injunctive relief, all Plaintiffs will suffer irreparable harm.

134.    Candidate Plaintiffs will be forced to campaign and appear on ballots in an environment that suppresses their political speech, distorts their messages, and materially burdens their ability to associate with voters.

135.    Voter Plaintiff will face elections conducted under a regime that predictably increases down-ballot roll-off, exacerbates racially polarized voting, and diminishes his equal opportunity to participate and elect representatives of his choice.

136.    Party Plaintiffs will have their expressive and associational activities impaired, including recruiting, endorsing, supporting, and communicating with respect to local candidates and issues.

137.    Municipal Plaintiffs will be compelled to plan, administer, and conduct elections pursuant to an unlawful regime that infringes on the rights of their citizens.

138.    These injuries are concrete, particularized, and imminent.

139.   Enjoining the enforcement and compelled implementation of the EYEL safeguards the federal constitutional and statutory rights of candidates, voters, political parties, and local governments.

# VI.
## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief against Defendants:

- Declare that the EYEL violates the First Amendment to the United States Constitution by impermissibly burdening and suppressing political speech, association, and petition in local elections;

- Declare that the EYEL violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301;

- Enjoin Defendants from enforcing, implementing, or giving any effect to the EYEL until further orders of this Court;

- Order that localities subject to the EYEL be given an opportunity to opt-out according to a procedure ordered by this Court;

- Award Plaintiffs their reasonable attorneys' fees, expert witness fees, and costs of litigation pursuant to 42 U.S.C. § 1988(b) and 52 U.S.C. § 10310(e); and

- Grant such other and further relief as the Court deems just and proper.


Dated: October 30, 2025                              Respectfully submitted,

                                                     **BREWER, ATTORNEYS & COUNSELORS**

                                                     /s/ *William A. Brewer III*
                                                     William A. Brewer III
                                                     750 Lexington Avenue
                                                     New York, NY 10022
                                                     Tel: 212-489-1400
                                                     wab@brewerattorneys.com

                                                     ***COUNSEL FOR PLAINTIFFS***