# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK
### CENTRAL ISLIP

NEW YORK REPUBLICAN STATE COMMITTEE,
NEW YORK STATE ASSOCIATION OF TOWN
SUPERINTENDENTS OF HIGHWAYS, INC.,

Nassau County Plaintiffs
NASSAU COUNTY REPUBLICAN COMMITTEE,
COUNTY OF NASSAU, TOWN OF HEMPSTEAD, TOWN
OF OYSTER BAY, TOWN OF NORTH HEMPSTEAD,
JENNIFER DESENA, JOHN FERRETTI, MAZI M. PILIP,
LAURA A. RYDER, ELAINE PHILLIPS,

Suffolk County Plaintiffs
SUFFOLK COUNTY REPUBLICAN COMMITTEE,
COUNTY OF SUFFOLK, TOWN OF BROOKHAVEN,
TOWN OF ISLIP, TOWN OF RIVERHEAD, TOWN OF
HUNTINGTON, RAHEEM SOTO, JAROD MORRIS,
LAURA ENDRES,

Orange County Plaintiffs
ORANGE COUNTY, STEVEN M. NEUHAUS, LEIGH J.
BENTON, BARRY CHENEY, THOMAS J. FAGGIONE,
PAUL RUSZKIEWICZ, KATHY STEGENGA, JANET
SUTHERLAND, and PETER V. TUOHY,

                    Plaintiffs,

            v.

NEW YORK STATE BOARD OF ELECTIONS, STATE OF
NEW YORK, and KATHY HOCHUL, in her official capacity
as Governor of the State of New York,

                    Defendants.

No. 2:25-cv-06083-GRB-AYS

**FIRST AMENDED COMPLAINT**

**JURY TRIAL DEMANDED**

# I.
## PRELIMINARY STATEMENT

*"Let us not seek the Republican answer or the Democratic answer but the right answer." –*

*John F. Kennedy*

1.      This lawsuit challenges the State of New York's Even Year Election Law ("EYEL") because it violates the First Amendment to the United States Constitution and Section 2 of the Voting Rights Act of 1965 ("VRA"). As the bipartisan coalition of those opposed to this law grows, so too has the group of Plaintiffs—the New York State Republican Committee, candidates from the counties of Nassau, Suffolk, and Orange, municipalities, and voters from those counties and elsewhere—that brings this action to defend their communities against a state law that purposely and effectively will suppress local speech, increase racial polarization, and erode democracy in every county outside of the five boroughs that comprise New York City.

2.      For more than a century, New York has protected local self-government from the vagaries of state politics and federal overreach. The prevalence of odd-year local elections dates back to the Progressive Era—from the 1890s to 1920s when reforms addressing political corruption swept the nation. In New York, this electoral framework remained a celebrated civic institution protecting local candidates from being "drowned out" of local elections by state and national control of the even-year election cycle. The EYEL upends that protection for approximately 60% of the citizens of voting age; that is, for those living outside of NYC.

3.      The EYEL was enacted in December 2023 by a Democrat-controlled state legislature determined to use the EYEL to force thousands of local elections off their traditional odd-year schedules and onto crowded, even-year ballots dominated by national issues and races.  Cloaked in the rhetoric of increased "voter turnout," the change is a calculated attempt to centralize top-of-the-ticket political power at the expense of local candidates being able to reach their constituencies in Republican-controlled counties. However, the EYEL so badly undermines the ability of local

candidates to reach their constituents that several statewide associations of locally elected officials oppose it. This includes, among others, the New York Association of Towns (NYAOT) and the New York State Association of Counties (NYSAC).

4.      The EYEL violates the First Amendment because it actually and intentionally imposes severe burdens on candidates' core political speech. By mandating the consolidation of local races onto ballots dominated by federal and state contests without the ability of political subdivisions to opt out, the EYEL deprives local candidates of a meaningful opportunity to convey their messages to voters by pushing their races to the bottom of what will become exceedingly long ballots.

5.      Defendants conspired to enact the EYEL with full awareness that consolidating local elections into high-salience federal election cycles would cause asymmetric effects depending on the political composition of a particular jurisdiction. In states where one party dominates statewide and federal contests, forcing local elections into even-year cycles predictably suppresses the voices of local candidates affiliated with the minority party by placing local campaigns beneath nationalized messaging and partisan cues. Defendants knew that in New York—where Republicans constitute a durable minority statewide—the EYEL would suppress candidates in Republican-led local governments, particularly in counties such as Nassau where local elections historically function as community-driven, issue-focused contests.

6.      The statute also violates Section 2 of the Voting Rights Act. In communities already marked by racial polarization, it will amplify disparities in political participation and exacerbate racially polarized voting.

7.      Numerous local officials, municipalities, candidate-representative organizations, and voters across the State are united in opposition to the EYEL. They recognize that local elections are not administrative formalities but living expressions of democracy in their communities: in town halls, municipal boards, and county legislatures where government remains personal and accountable.

8.      Plaintiffs bring this action to obtain declaratory and injunctive relief to protect the constitutional and statutory rights of candidates, and to ensure that New York's local elections remain meaningful, equitable, and free from political manipulation.

## II.

## PARTIES AND RELEVANT NONPARTIES

9.      ***Plaintiff New York Republican State Committee.*** The New York Republican State Committee is responsible for recruiting, nominating, endorsing, and supporting Republican candidates for town and county office and for communicating the Party's platform to voters throughout New York. The New York Republican State Committee sues on its own behalf and on behalf of its members and candidates.

10.     ***Plaintiff New York State Association of Town Superintendents of Highways, Inc.*** The New York State Association of Town Superintendents of Highways, Inc. ("NYSAOTSOH") is a statewide, nonpartisan membership organization representing elected and appointed town highway superintendents across the State of New York. NYSAOTSOH advocates on behalf of its members regarding matters affecting town highway administration, infrastructure, and governance, including the timing and conduct of local elections for the office of Town Superintendent of Highways. The EYEL directly affects the election cycles, terms of office, and electoral environment for NYSAOTSOH's members. NYSAOTSOH brings this action on behalf of itself and its more than 1,100 members.

### Nassau County Plaintiffs

11.     ***Plaintiff Nassau County Republican Committee.*** The Nassau County Republican Committee is responsible for recruiting, nominating, endorsing, and supporting Republican candidates for town and county office and for communicating the Party's platform to voters in

4

Nassau County. The Nassau County Republican Committee sues on its own behalf and on behalf of its members and candidates.

12.     ***Plaintiff County of Nassau.*** The County of Nassau is a political subdivision of the State of New York whose elections and elected officials will be affected by the EYEL.

13.     ***Plaintiff Town of Hempstead***. The Town of Hempstead is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

14.     ***Plaintiff Town of Oyster Bay***. The Town of Oyster Bay is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

15.     ***Plaintiff Town of North Hempstead***. The Town of North Hempstead is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

16.     ***Plaintiff Jennifer DeSena — Town Supervisor.*** DeSena serves as the Supervisor of the Town of North Hempstead. She was elected in November 2025 and, under the EYEL's transitional framework, must seek re-election in the next scheduled cycle rather than serving a full traditional term.

17.     ***Plaintiff John Ferretti — Town Supervisor.*** Ferretti serves as the Supervisor of the Town of Hempstead. He was elected in November 2025 and, pursuant to the EYEL, must run again in the next election cycle rather than serving a full traditional term. Ferretti previously served four consecutive terms on the Nassau County Legislature and as Chief Deputy County Clerk of Nassau County.

18.     ***Plaintiff Elaine Phillips — County Comptroller.*** Phillips is the Comptroller of Nassau County. She was elected in November 2025 and, as a result of the EYEL, will serve a shortened transitional term. Phillips must seek re-election in the next scheduled election cycle mandated by the EYEL. She previously served as Mayor of the Village of Flower Hill and as New York State Senator for the 7th District.

19.     ***Plaintiff Mazi M. Pilip — County Legislator.*** Pilip serves as a Legislator for Nassau County's 10th District and is a candidate for re-election. She was elected in November 2025 and,

under the EYEL, will run again in the next election cycle on a shortened timeline. Pilip previously ran as a candidate in the February 2024 special election for the United States House of Representatives.

20.    ***Plaintiff Laura A. Ryder — Town Councilmemb*er.** Ryder serves on the Town Board of the Town of Hempstead, representing the 4th Councilmanic District and is a candidate for re-election. She was elected in November 2025 and, due to the EYEL, must stand for election again in the next accelerated cycle. Ryder previously served as a trustee on the Lynbrook Village Board.

**Suffolk County Plaintiffs**

21.    ***Plaintiff Suffolk County Republican Committee.*** The Suffolk County Republican Committee (together with the New York Republican State Committee and Nassau County Republican Committee, "**Party Plaintiffs**") is responsible for recruiting, nominating, endorsing, and supporting Republican candidates for town and county office and for communicating the Party's platform to voters in Suffolk County. The Suffolk County Republican Committee sues on its own behalf and on behalf of its members and candidates.

22.    ***Plaintiff County of Suffolk***. The County of Suffolk is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

23.    ***Plaintiff Town of Brookhaven***. The Town of Brookhaven is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

24.    ***Plaintiff Town of Islip***. The Town of Islip is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

25.    ***Plaintiff Town of Riverhead***. The Town of Riverhead is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

26.    ***Plaintiff Town of Huntington***. The Town of Huntington is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

27.    ***Plaintiff Raheem Soto — Candidate for Suffolk County Legislature.*** Soto was a candidate for the Suffolk County Legislature, 2nd District, in November 2025 and intends to run again in the next election cycle mandated by the EYEL. Soto is the publisher of the Messenger Papers newspaper chain based in Suffolk County.

28.    ***Plaintiff Jarod Morris — Candidate for Suffolk County Legislature.*** Morris was a candidate for the Suffolk County Legislature, 15th District, in November 2025 and intends to run again in the next election cycle mandated by the EYEL. Morris is a trustee and former president of the Wyandanch Union Free School District Board of Education, a registered voter residing in New York, and a member of a racial minority protected under the VRA.

29.    ***Plaintiff Laura Endres — Candidate for Suffolk County Legislature.*** Endres was a candidate for the Suffolk County Legislature, 5th District, in November 2025 and intends to seek election again in the next scheduled cycle under the EYEL. She is an attorney and community advocate.

**<u>Orange County Plaintiffs</u>**

30.    ***Plaintiff Orange County.*** Orange County (together with the Counties of Nassau and Suffolk, and the Towns of Hempstead, Oyster Bay, North Hempstead, Brookhaven, Islip, Huntington, and Riverhead, the "**Municipal Plaintiffs**") is a political subdivision of the State of New York whose elections and elected officials are directly affected by the EYEL.

31.    ***Plaintiff Steven M. Neuhaus — County Executive of Orange County.*** Neuhaus serves as the County Executive of Orange County and will be a candidate for re-election. He was elected in November 2025 and, due to the EYEL, will serve a shortened transitional term before running again in the next scheduled election. Prior to serving as County Executive, Neuhaus was the Supervisor of the Town of Chester.

32.    ***Plaintiff Leigh J. Benton — County Legislator.*** Benton serves as a Legislator in the Orange County Legislature, representing District 16, and will be a candidate for election in the

next scheduled cycle under the EYEL. He brings this action based on the burdens imposed on his candidacy and future campaigns by the Even Year Election Law.

33.    ***Plaintiff Barry J. Cheney — County Legislator.*** Cheney serves as a Legislator in the Orange County Legislature, representing District 8, and is a candidate for re-election. He campaigned and appeared on the ballot in November 2025 under the EYEL's altered election schedule and must seek office in the EYEL's next accelerated cycle.

34.    ***Plaintiff Thomas J. Faggione — County Legislator.*** Faggione serves as a Legislator in the Orange County Legislature, representing District 13. He was elected in November 2025 and, under the EYEL, must run again in the next scheduled election rather than serving a full traditional term.

35.    ***Plaintiff Paul Ruszkiewicz — County Legislator.*** Ruszkiewicz serves as a Legislator in the Orange County Legislature, representing District 19, and will be a candidate for re-election. He was elected in November 2025 and, pursuant to the EYEL, must run again in the next accelerated election cycle rather than serving a full traditional term.

36.    ***Plaintiff Kathy Stegenga — County Legislator.*** Stegenga serves as a Legislator in the Orange County Legislature, representing District 21. She was elected in November 2025 and, as a result of the EYEL, must run again in the next scheduled cycle.

37.    ***Plaintiff Janet Sutherland — County Legislator.*** Sutherland serves as a Legislator in the Orange County Legislature, representing District 18. She was elected in November 2025 and must seek office in the next election cycle mandated by the EYEL rather than serve a full traditional term.

38.    ***Plaintiff Peter V. Tuohy — County Legislator.*** Tuohy (together with Ferretti, Pilip, Soto, Morris, Endres, Ryder, Phillips, Neuhaus, Benton, Cheney, Faggione, Ruszkiewicz, Stegenga, and Sutherland, the "**Candidate Plaintiffs**") serves as a Legislator in the Orange County Legislature,

representing District 10. He was elected in November 2025 and will be compelled by the EYEL to stand for election again on an accelerated timeline.

**Defendants**

39.    Defendant New York State Board of Elections ("NYSBOE") is the state agency charged with the administration, interpretation, and enforcement of New York Election Law, including the implementation of election calendars, ballot formats, and election procedures governing county and municipal elections throughout the State. The NYSBOE is responsible for issuing guidance to local boards of elections, certifying election-related rules and practices, and ensuring compliance with state election statutes, including the EYEL.

40.    Defendant State of New York is the enacting jurisdiction for the EYEL.

41.    Defendant Kathy Hochul is the Governor of the State of New York, is sued in her official capacity as the highest-ranking government official responsible for implementing the EYEL.

**Relevant Nonparties**

42.    Relevant nonparty Zoran Mamdani is the Mayor-elect of the City of New York. His election and political mandate was held in an odd-year, high-salience election cycle that was not affected by the EYEL. New York City was expressly exempted from the EYEL's operative provisions, allowing Mr. Mamdani and similarly situated New York City candidates to campaign in electoral environments that were not dominated by statewide and national races by subjecting their municipal elections to consolidation mandates imposed on counties and towns outside the City. In addition, while Mr. Mamdani voted in favor of the EYEL, he, as well as a majority of his New York City constituents, voted against New York City's own even-year local election proposal.[1]

---

[1] "Mamdani says he's voting for housing ballot proposal, against even-year election measure," *Gothamist* (Nov. 4, 2025),    https://gothamist.com/news/mamdani-says-hes-voting-for-housing-ballot-proposals-against-even-year-election-measure

9

43.     Relevant nonparties include all members of the New York State Assembly and New York State Senate who voted in favor of the EYEL while representing districts located within New York City whose voters rejected New York City's own even-year local election proposal. These Assemblymembers and Senators supported legislation mandating even-year election schedules for counties and municipalities outside New York City while maintaining an exemption for their own constituents.

### III.

### JURISDICTION AND VENUE

44.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(a) because this case arises under the First and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301.

45.     This Court has the authority to grant declaratory relief under 28 U.S.C. § 2201 and injunctive relief under 28 U.S.C. § 2202.

46.     Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to these claims occurred within this District, including the adoption, administration, and anticipated enforcement of the EYEL with respect to Plaintiffs in Nassau and Suffolk Counties. Defendants are subject to personal jurisdiction in this District because they implement and enforce the EYEL in this jurisdiction.

47.     This Court has authority to award attorneys' fees and costs pursuant to 42 U.S.C. § 1988(b) and 52 U.S.C. § 10310(e).

### IV.
### FACTUAL BACKGROUND

#### A.  Local Elections in Odd Years Are a Celebrated Civic Institution

48.     For more than a century, New York's local elections have occurred in odd years and stood as a hallmark of civic engagement. Born in the Progressive Era of the late 1800s, reformers directed their efforts to shield local democracy from political corruption. Thus, nineteenth-century reformers sought

to liberate local politics from the grip of the state and national party machines that dominated the political order of that time.



[2]

49.    At New York's 1894 Constitutional Convention, delegates deliberately separated municipal and county elections from federal and statewide contests. Their goal was to create a forum where community issues, not national partisanship, could be debated on their own terms.

50.    These reforms reflected a simple but profound insight: local government is where citizens most directly experience and shape their communities in our democracy. Not only in New York, but nationally, progressive reformers viewed local elections held in odd years as a safeguard against corruption and voter manipulation.

51.    Mayors, town supervisors, county executives, legislators, and comptrollers campaigned directly on issues that matter most to their constituents. Importantly, the intent was that those candidates would not be required to compete for attention or align their political platforms with the more national or statewide candidates vying in presidential or gubernatorial contests.

---

[2] From Harper's Weekly, October 7, 1871, page 944.

52.     Odd-year elections reflect the animating values of the First Amendment. Aware that elections held in odd years provide local candidates and voters a meaningful opportunity to exchange ideas, debate local issues, and hold officials accountable, odd-year elections reflected a wise choice to adopt an election system to enhance values core to the First Amendment. The timing of these elections is not a mere administrative detail, but a choice aimed at protecting the marketplace of ideas and democracy at the local level.

**B.     Tammany Hall Redux: Albany's Attempt to Consolidate Power through the EYEL**

53.     In December 2023, the New York Legislature enacted Chapter 741 of the Laws of 2023, known as the Even Year Election Law, or EYEL. The EYEL was disingenuously presented as an effort to "increase voter participation" by consolidating local, state, and federal elections in a single day on a single ballot. In practice, the statute will force nearly all local elections outside of New York City off odd-year schedules and onto crowded even-year ballots dominated by federal and statewide races.

54.     Local leaders throughout New York warned Defendants that the EYEL would drown out local voices and undermine community debate. Nevertheless, the bill was introduced near the end of the legislative session by those aligned with Governor Hochul (mostly legislators from the boroughs of New York City—whose elections were not covered by the proposed legislation) and others focused on national and state-wide issues. The bill advanced without meaningful committee deliberation or public hearings.

55.     For most academics, demographers, political historians, good-government experts, and First Amendment advocates, the bill was labeled a "disaster." Few were surprised when the bill received bipartisan opposition from most local officials statewide, as well as groups like the New York Association of Towns. The New York State Association of Counties, comprised of Democratic and Republican County Executives representing all 57 counties outside New York City, formally urged the

Governor to veto the bill, warning that the law would drown out local issues and undermine "debate[] and discuss[ion] in the local sphere."[3]

56.    Likewise, in a July 2023 letter urging Governor Kathy Hochul to veto the EYEL legislation, New York State Board of Elections Commissioner Anthony J. Casale and New York State Board of Elections Co-Chair Peter S. Kosinski wrote, "We believe this is an ill-advised effort that will diminish the attention paid to local office elections while not meaningfully increasing voter participation."[4]

57.    Predictably, those concerns were ignored. On December 22, 2023, Governor Kathy Hochul signed the bill into law. The EYEL governed the November 2025 election cycle and beyond.



58.    The EYEL moves the election of nearly all county and town offices to even-numbered years to coincide with the November general elections for state and federal offices. It also amends Municipal

---

[3] New York State Association of Counties, Resolution No. 1, 2023 Fall Seminar Standing Committee on Intergovernmental Affairs: Resolution Encouraging Governor Kathy Hochul to Veto Legislation Requiring that Local Elections be Held in Even-Numbered Years (2023), https://www.nysac.org/media/31hbhsge/23-inter-gov-regulations-reso-1.pdf

[4] New York State Board of Elections, *Letter to Elizabeth Fine, Acting Counsel to the Governor, Re: Assembly Bill 4282-B / Senate Bill 3505-B (Recommendation: Veto)* (July 19, 2023), available at https://www.nysac.org/media/bj5dq2um/state-election-commissioners-letter-against-even-year-local-elections-bill.pdf

Home Rule Law § 34(3) to prohibit any county charter or local law from superseding this new statewide requirement.

59.    Pursuant to the statute, the first affected elections occurred in November 2025, after which all subsequent elections for affected offices will be held in even-numbered years. To align the calendar, the law shortens certain terms of office so that incumbents elected in 2025 will serve one- or three-year transitional terms before the next election cycle.

60.    The law covers a broad array of local offices outside of New York City, including: County Executives and County Legislators, County Comptrollers and Treasurers, Town Supervisors, Town Board Members, Town Clerks, and Highway Superintendents; as well as numerous municipal and special-district offices whose elections had previously occurred in odd years. Some positions, such as Sheriffs, County Clerks, and Surrogate Judges, are exempted because their terms are fixed in the State Constitution or because they serve three-year terms.

61.    The EYEL's effects are sweeping. It consolidates thousands of local races onto the same ballots as presidential, gubernatorial, and congressional contests. This mass consolidation will erase the temporal and communicative space that sustains local democratic dialogue.

62.    In Nassau County, elections for County Executives, County Comptroller, County Legislators, and numerous town offices—including those in Hempstead, Oyster Bay, and North Hempstead—will move from odd to even years after the election of 2025. Plaintiffs Elaine Phillips, John R. Ferretti, Laura A. Ryder, and Mazi M. Pilip will each be adversely affected by the law.

63.    In Suffolk County, the EYEL directly affects town and county elections in Brookhaven, Islip, Riverhead, Huntington, and other municipalities. Candidates such as Raheem Soto, Jarod Morris, and Laura M. Endres, each seeking seats in the Suffolk County Legislature in 2025, will run in a landscape fundamentally and detrimentally transformed by the EYEL.

64.    In Orange County, the EYEL likewise affects contests for County Executive and the County Legislature. Plaintiffs Steven M. Neuhaus, Leigh J. Benton, Barry J. Cheney, Thomas J. Faggione, Paul

Ruszkiewicz, Kathy Stegenga, Janet Sutherland, and Peter V. Tuohy—each of whom currently serves or is seeking election to Orange County offices—will see their election cycles negatively altered and their campaigns conducted under the new electoral framework.

65.    Defendants were well aware that election-timing rules are not politically neutral in operation. Defendants intended that consolidating elections into even-year cycles would systematically advantage them at the local level given their dominance statewide and in federal races, which would suppress the effectiveness of local campaigns associated with the minority party.

66.    In New York, Republicans are typically a minority in statewide and federal elections. For more than a century, New York's odd-year local election structure functioned as a neutral safeguard preserving space for community-level debate and voter evaluation of local candidates on local issues, independent of statewide and national partisan dynamics. As a result, at least in some circumstances, the minority party was able to win local elections by reaching voters on salient issues in such contests. Defendants intended that compelling local elections to occur in even years would systematically subordinate local contests to an electoral environment dominated by statewide and federal races in which the governing party enjoys entrenched advantages. The law was specifically meant to translate the majority party's statewide advantage into an advantage in local elections outside of New York City. By imposing the EYEL, Defendants knowingly altered the electoral framework in a manner that predictably—and intentionally—disadvantages local candidates and officials associated with the minority party.

## C. Drowning Democracy: The EYEL Severely Burdens Political Speech and Association

67.    Adopted without any opportunity for counties or political subdivisions to opt out, the EYEL imposes severe burdens on core political speech and the ability for like-minded voters to associate around important topics in local elections. By forcing local elections onto ballots dominated by federal and state contests, the EYEL submerges municipal voices beneath the noise of national politics. Doing

so was intended to deprive local candidates and voters of the civic dialogue essential to their engagement on the issues.

### i. Lost Messages: Visibility & Cost of Speech

68.    Local candidates will now be forced to compete for visibility, media access, and fundraising against national campaigns that saturate television, radio, social media, and mail. Campaign costs for local candidates will be prohibitively expensive. Virtually all political science experts know—as do the vast majority of local candidates—that it will be impossible to reach local voters in an information environment dominated by presidential and congressional races, effectively depriving candidates for local offices from meaningful political communication. Put simply: local candidates will not be able to compete in that landscape.[5]

69.    Because local contests will receive minimal media or civic attention during even-year cycles, candidates will lose traditional avenues of communication—such as letters to local papers, town-hall meetings, neighborhood debates, and earned media coverage that currently sustains municipal discourse. National campaigns will dominate press cycles and crowd out community-level debate, leaving local issues invisible in the broader political conversation.[6]

70.    Empirical data confirms this disparity in visibility, as political advertising revenue for the five largest publicly held local television station groups skyrockets in even-numbered years, demonstrating how national races consume the marketplace for voter attention.[7]

---

[5] Daniel Konstantinovic, *Election Ad Spending Caused Prices to Surge, Forcing Brands Elsewhere*, eMarketer (Nov. 1, 2024), https://www.emarketer.com/content/election-ad-spending-caused-cpm-surge.

[6] Charles Angelucci, Julia Cage & Michael Sinkinson, *Media Competition and News Diets*, 16(2) Am. Econ. J.: Microecon. 62 (2024).

[7] Christopher Aubsin & Sarah Naseer, *Local TV News Fact Sheet*, Pew Research Center (Sept. 14, 2023), https://www.pewresearch.org/journalism/fact-sheet/local-tv-news.



Political advertising revenue at local TV companies
Total political advertising revenue for five publicly held local TV station companies (in U.S. dollars)

Pew Research Center

71.     Faced with an advertising environment inflated by billions of dollars in national spending, local candidates will not be able to compete—an "unnecessary gag" on local speech that transforms their campaigns into mere footnotes on overcrowded ballots.

### ii. Distorted Messages: Content & Information Effects

72.     In fact, virtually all voting and election scientists agree that the EYEL will nationalize local elections. Voters, deprived of sustained engagement with local issues, will increasingly rely on party labels, top-of-the-ticket cues, and prejudices rather than substantive evaluation of local candidates. Collectively, the EYEL will transform local elections from deliberative exercises in community self-government into reflexive expressions of national partisanship and prejudice, undermining the purpose of the First Amendment and its protection of political debate.

73.     For example, one recent survey found that "4 in 10 respondents…prioritize[ed] local issues…over partisan affiliation."[8] However, beginning in 2026, the EYEL will ensure that national (or

---

[8] Edward L. Lascher, Jr., Brian Adams & Danielle Martin, *Local Elections Are Less Partisan Because Voters Will Cross Party Lines When Issues Hit Close to Home*, The Fulcrum (Aug. 21, 2024), https://thefulcrum.us/bipartisanship/partisanship-in-local-elections.

statewide) concerns will eclipse local priorities, eroding the informational environment necessary for issue-based local voting. A Newspaper Research Journal study reached the same conclusion: "[i]n an electoral environment increasingly saturated by national affairs, voters are likely to think federally, but fail to act locally."[9]

74.    It is universally accepted that long, crowded ballots (which will be the result in even-year elections) increase the number of voters who rely on confirmation bias that undermines electoral accountability.[10] As information quality drops, voters default to cues, weakening the feedback loop between local performance and voter judgment.

### iii. Biased Voting & Stereotypes

75.    Low-information environments increase reliance on heuristics, including partisan, racial, and gender stereotypes. Numerous studies conclude that when voters are unable to acquire information about down-ballot contests until they go to the polls, they will rely on partisan prejudices.

76.    Not only does a low-information election increase reliance on partisan affiliations, it increases voters' reliance on demographic heuristics, particularly race and gender stereotypes. Empirical research confirms this phenomenon: in low-information elections, voters rely on stereotypes.

77.    In sum, when candidate information is limited, as is the case when elections are clustered together, voters make assumptions based on the race, ethnicity, and gender of the candidates.[11]

78.    These predictable biases are not abstract. They surface when ballots are long and information is thin—precisely the environment the EYEL creates.

### iv. Evidence from Other Jurisdictions

---

[9] Christopher Chapp & Peter Aehl, *Newspapers and Political Participation: The Relationship Between Ballot Rolloff and Local Newspaper Circulation*, 42(2) Newspaper Res. J. 235, 250 (2021).

[10] *See, e.g.,* Lockwood, Ben, "Confirmation Bias and Electoral Accountability," Centre for Economic Policy Research (Jan. 12, 2017).

[11] Melody Crowder-Meyer, Shana Kushner Gadarian & Jessica Trounstine, *Voting Can Be Hard, Information Helps*, 56(1) Urban Affs. Rev. 124 (2019).

79. Experience from other states confirms these harms. In jurisdictions such as California and Nevada, where laws similar to the EYEL were implemented, down-ballot drop off demonstrates reduced engagement with local issues.[12] More broadly, empirical data shows that consolidating elections on even years greatly exacerbates incumbency advantage, resulting in fewer competitive municipal races and weakened governmental accountability.[13] These are exactly the speech and association harms described above.

80. In Indiana, locals voiced opposition to proposed changes advanced by Republican lawmakers that would move local elections to even-numbered years and require all counties to adopt vote centers.[14] Critics argue persuasively that the proposed changes would erode local control, create constitutional conflicts, and bury community races beneath federal contests. Indiana Democratic Party Chair Karen Tallian noted that small towns already have the option to align their elections and urged the state not to impose the shift on larger municipalities.

### v. Constitutional Synthesis

81. By erasing the temporal and communicative space that makes local democracy thrive, the EYEL imposes a direct and substantial burden on core political speech and the ability of candidates to connect with voters and voters to associate with others on the issues. The burdens on the First Amendment protections are not only obvious as a consequence of rising costs, but by degrading visibility, distorting content, and increasing bias in the act of voting. These burdens cannot be justified by generalized appeals to convenience where less restrictive alternatives (e.g., voter information programs, voter participation outreach) exist to increase participation without nationalizing local elections.[15]

---

[12] Ricardo Torres-Cortez, *Seaman, Berkley Say Getting Voters in Downballot Mayor Race is a Challenge*, Las Vegas Rev.-J. (Nov. 2, 2024), https://www.reviewjournal.com/news/politics-and-government/las-vegas/seaman-berkley-leaning-on-bipartisan-bona-fides-for-nonpartisan-race-3205253/.

[13] Justin de Benedictis-Kessner, *Off-Cycle and Out of Office: Election Timing and the Incumbency Advantage*, 80 J.Pol. 119 (2018).

[14] Ind. Pub. L. No. 108-2025 (H. Enrolled Act 1633) (Apr. 22, 2025).

[15] The First Amendment is "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Anderson v. Celebrezze*, 460 U.S. 780, 794 (1983) (quoting *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 270 (1964)).

82.     Indeed, federal courts have held that ballot design can create a severe burden under the Anderson-Burdick framework. Those holdings follow the recognition that discrimination results from "restrictions [which] operate as a mechanism to exclude certain classes of candidates from the electoral process."[16]

83.     In *Kim*, the Third Circuit recognized that the burdens placed on candidates who were relegated to "Ballot Siberia" when they were "put in undesirable ballot positions," do violence to core First Amendment protections.[17] Even "while candidates [were] not completely excluded from the ballot and so [could] garner votes, the discriminatory nature of the . . . system [required] that the state legislation satisfy heightened scrutiny."[18]

84.     Examining the burden on candidates, the *Kim* court noted that courts "don't just ask whether a candidate's name physically appears on the ballot;" rather, "the inquiry is whether the challenged restriction…unnecessarily burdens the availability of political opportunity."[19]

85.     Plaintiffs here allege more severe burdens that emanate from the primacy effect which results when the EYEL relegates Plaintiffs to "Ballot Siberia." As the Third Circuit noted, "[e]vidence is key to the balancing of interests at the heart of the Anderson-Burdick framework."[20] In *Kim*, the court credited plaintiffs' experts who testified at the District Court that "there is a pervasive primacy effect that favors candidates in elections that appear in an early position on a ballot."[21]

86.     The EYEL intentionally creates an election scheme through which "primacy [will] significantly impact election results," harming Plaintiffs by drowning their elections in the flood of national and statewide contests.[22] Thus, the EYEL places a severe burden on Plaintiffs' free speech and association rights under the First Amendment and fails scrutiny.

---

[16] *Kim v. Hanlon*, 99 F.4th 140, 156 (3d Cir. 2024).
[17] *Id*. at 157.
[18] *Id*.
[19] *Id*. (internal quotations omitted).
[20] *Id*. at 155.
[21] *Id*. at 150.
[22] *Id*. at 157.

### vi. Burdens on the Candidate Plaintiffs

87.    The burdens imposed on the Candidate Plaintiffs arise directly from the structural changes described above. By compelling local elections to occur in even-year cycles dominated by statewide and federal races, Defendants have altered the electoral environment in which Candidate Plaintiffs must communicate with voters, compete for attention for their platform and the ability to reach voters with whom they desire to associate around local issues. These burdens are not incidental or speculative—they are the predictable consequence of a state-imposed election framework that intentionally subordinates local campaigns to national electoral dynamics. As applied to the Candidate Plaintiffs, the EYEL suppresses the effectiveness of their political speech and ability to associate by diminishing visibility, inflating communication costs, and distorting the informational environment in which voters evaluate local candidates.[23]

88.    Nassau County Candidate Plaintiffs Ferretti, Pilip, Ryder, and Phillips will be harmed because their contests will be moved onto even-year ballots dominated by statewide and federal races. That change will suppress their core political speech and impede their ability to associate with likeminded voters, diminish visibility for town- and county-level issues, and materially burden their ability to communicate with, and organize, voters.

89.    Likewise, Suffolk County Candidate Plaintiffs Soto, Morris, and Endres will face consolidation onto high-salience, even-year ballots—forcing their campaigns into an environment saturated by national messaging, inflating the cost of reaching voters, and impeding their ability to engage in political expression and association focused on county issues.

90.    The Orange County Candidate Plaintiffs—Benton, Cheney, Faggione, Ruszkiewicz, Stegenga, Sutherland, and Tuohy—will likewise be directly burdened by the EYEL. Their ability to engage constituents on local concerns will be overwhelmed by state and national political discourse.

---

[23] Increasing the number of voters is not the primary goal of the First Amendment especially when these voters are uninformed and uninterested in local debate.

### D. The EYEL Disproportionately Affects Minority Voters and Will Increase Racial Polarization

91.     Section 2(a) of the Voting Rights Act provides that "No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color."[24]

92.     Section 2(b) further provides that "A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice."[25]

93.     The Supreme Court recognizes that Section 2 protects against more than outright barriers to voting but also practices that interact with historical and social conditions to diminish minority voters' ability to participate equally in the political process.[26]

94.     More recently, the Court reaffirmed that the "essence of a § 2 claim" is "that a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities" of minority and non-minority voters to elect their preferred representatives.[27]

95.     The Supreme Court's Section 2 analysis recognizes that claims may be prospective and assessed in the context of how a challenged practice is likely to interact with real-world conditions and history.[28]

96.     New York's newly enacted Even Year Election Law constitutes such a discriminatory practice. By requiring local elections, including county, municipal and town offices, to be consolidated into even-

---

[24] 52 U.S.C. § 10301(a).
[25] 52 U.S.C. § 10301(b).
[26] *Thornburg v. Gingles*, 478 U.S. 30 (1986).
[27] *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. 647, 660 (2021) (citing *Gingles*).
[28] *See, e.g., Gingles; Brnovich; Allen v. Milligan*, 599 U.S. 1 (2023).

numbered years with federal and statewide elections, the EYEL dramatically alters the electoral landscape in a manner that disproportionately burdens minority voters.

97.    For decades before *Shelby County v. Holder*, 570 U.S. 529 (2013), many parts of New York were covered jurisdictions under the Section 5 preclearance regime, requiring federal approval before election changes took effect. That preclearance regime ended with *Shelby County*, removing an ex ante check on changes like the EYEL.

98.    On June 20, 2022, New York adopted the John R. Lewis Voting Rights Act, including a preclearance regime for covered localities: an acknowledgment by the State that local election-law changes can burden minority voters and often warrant advance review.

99.    Federal courts in this circuit frequently find Section 2 violations in New York localities, reflecting enduring racially polarized voting and structural barriers.[29]

100.    Consolidating local races onto high-salience even-year ballots will predictably submerge local contests beneath federal and statewide campaigns, lengthen ballots, and increase down-ballot roll-off, with voters casting votes for top-of-ticket offices but skipping local races. Political science literature confirms, without meaningful contrary support, that even when overall turnout rises in on-cycle "even-year" elections, roll-off occurs and will typically be uneven across communities, affecting who elects local officials. Worse, the EYEL will exacerbate patterns in polarized voting across racial lines.

101.    The EYEL represents a statewide departure from New York's long-standing odd-year local election schedules, precisely the kind of departure from standard practice that *Brnovich* flags for review when it burdens minority voters given the jurisdiction's history.

102.    Although New York claims the EYEL will increase participation, that objective can be accomplished by means that do not carry foreseeable, disparate costs for minority communities.

---

[29] *See, e.g., Goosby v. Town Bd. of Town of Hempstead*, 180 F.3d 476 (2nd Cir. 1999); *Clerveaux v. East Ramapo Cent. Sch. Dist.*, 984 F.3d 213 (2nd Cir. 2021).

Assessments of the impacts of ballot length, voter-information access, and administrative capacity demonstrate that the EYEL's means are tenuous and pretextual.

103.    The EYEL became operative with the November 2025 election cycle. Without relief, Plaintiffs will—beginning with 2026—vote in elections with intensified racially polarized voting, denying minority voters, particularly in racially diverse political subdivisions with at-large voting systems, an equal opportunity "to elect representatives of their choice."[30]

### i. Disproportionate Impact on Racial Minorities

104.    Studies uniformly conclude that changing local election timing dramatically alters the composition of the electorate. Moving elections from odd to even years will lower the engagement of voters in local races and can shift outcomes when roll-off and information costs are uneven.

105.    A recent Cambridge University study found that in elections with multiple concurrent elections (i.e., local and federal), selective abstention (i.e., roll-off) is significant and is influenced by how salient lower-level races appear.[31]

106.    Moreover, detailed reviews of local election reforms repeatedly show that although election consolidation *can* improve turnout, the increased ballot length results in "ballot drop-off"—meaning lower-visibility local races lost votes. In fact, empirical research illustrates that election consolidation does not guarantee increased participation in all races, rather, it redistributes participation.

107.    Empirical studies further show that consolidating local elections into even-year cycles produces longer ballots and higher rates of "roll-off," where voters cast ballots for top-of-ticket races but skip local contests, increase voter fatigue and blank responses in down-ballot races. More recent work by Chapp & Aehl links higher local-newspaper circulation to reduced roll-off,[32] while MIT Sloan reports

---

[30] 52 U.S.C. § 10301(b); In an electoral context, "at large" is defined as "[t]he whole membership or population (notably a city, county, state, province, nation, club or association), rather than a subset." U.S. Election Assistance Comm'n, Glossary of Election Terms 8 (Rev. Ed. 2009).
    [31] Reto Foellmi, Rino Heim & Lukas Schmid, *Voter Turnout and Selective Abstention in Concurrent Votes*, 2025 Pol. Sci. Res. & Methods 1, 1–20 (Cambridge Univ. Press), https://doi.org/10.1017/psrm.2025.10033.
    [32] Christopher Chapp & Peter Aehl, *Newspapers and Political Participation: The Relationship Between Ballot Rolloff and Local Newspaper Circulation*, 42 Newspaper Res. J. 235 (2021).

that the decline of local news and rise of nationalized information results in more voters voting a single party line across all races.[33] In even-year elections dominated by national coverage, voters receive <u>less information</u> about local candidates, leading to greater abstention and reliance on partisan cues.[34]

108.    In New York, the EYEL will place many additional local races on already lengthy even-year ballots and heighten information-access concerns for voters who face higher costs to acquire information regarding local races.

109.    Federal Courts weigh a number of socio-economic factors—including education, median income and housing—to consider the increase in the cost of participation in the political process. Public Census and ACS data show persistent race-based gaps in New York in educational attainment.[35] Furthermore, the 2025 New York State Annual Poverty Report shows similar race-based gaps in poverty levels throughout the state.[36]

110.    The EYEL's shift to even-year ballots will exacerbate roll-off and lower engagement as informational burdens rise in the minority communities that already face higher costs of participation. As New York cases reveal, minority-preferred candidates are vulnerable to structural changes that alter electorates or depress down-ballot completion.[37]

### ii. Increased Polarization Across Racial Lines

111.    The shifts in electorate composition engendered by the EYEL will amplify existing patterns of racially polarized voting. Consolidating local elections into even-year cycles brings into the electorate a larger share of voters who are less informed about local issues and more likely to vote along partisan and racial lines.

---

[33] Charles Angelucci, Julia Cage & Michael Sinkinson, *Media Competition and News Diets*, 16(2) Am. Econ. J.: Microecon. 62 (2024).

[34] *Id.*

[35] U.S. Census Bureau, American Community Survey (ACS) 1-Year Estimates, 2023, accessed via Census API: https://www.census.gov/data/developers/data-sets/acs-1year.html.

[36] New York State Community Action Association, *2025 New York State Annual Poverty Report* (2025), available at https://nyscaa.memberclicks.net/assets/docs/PovReport2025/2025%20NYS%20Poverty%20Report.pdf.

[37] *See, e.g., Goosby; East Ramapo*.

112.    Studies confirm that in low-information elections, voters rely on stereotypes, leading them to assume that female candidates are more liberal and honest and Black candidates are more focused on minority rights. This leads to voters "rely[ing] heavily on the partisan heuristic."[38]

113.    Empirical studies from jurisdictions that have adopted even-year election laws confirm exacerbated racially-polarized voting which results in minority-preferred candidates losing ground when local races are submerged in statewide and federal elections. The EYEL thus interacts with New York's already documented racial polarization to magnify disparities in minority political influence.

114.    Research shows that the increasing nationalization of U.S. elections has synchronized voter behavior across federal, state, and local levels, thereby undermining the localized, cross-racial coalitions that once characterized municipal politics. Abramowitz & Webster document that "negative partisanship" (voting motivated by animosity toward the opposing party) has spread uniform partisan voting patterns to all levels of government.[39] Likewise, a Fulcrum study found that roughly 40% of voters will cross party lines in local races only when local issues are salient;[40] in even-year contexts dominated by national narratives, that issue salience disappears. This convergence means that minority-preferred or nonpartisan local candidates (those who often rely on cross-party and neighborhood-based support) are especially disadvantaged when their races are submerged beneath high-salience federal contests.

### iii. Challenges Under the New York Voting Rights Act

115.    At the same time, the EYEL destabilizes the equilibrium of numerous local at-large election systems that currently operate equitably under odd-year schedules where candidates are able to overcome prejudices with information. Placing those systems on even-year ballots dominated by

---

[38] Brian F. Schaffner & Matthew J. Streb, *The Partisan Heuristic in Low-Information Elections*, 66 Pub. Op. Q. 559, 561 (2002).
[39] Alan I. Abramowitz & Steven Webster, *The Rise of Negative Partisanship and the Nationalization of U.S. Elections in the 21st Century*, 41 Electoral Stud. 12 (2016).
[40] Edward L. Lascher Jr., Brian Adams & Danielle Martin, *Local Elections Are Less Partisan Because Voters Will Cross Party Lines When Issues Hit Close to Home*, The Fulcrum (Aug. 21, 2024).

statewide and federal races will render many at-large structures newly susceptible to vote dilution claims under Section 2 of the Voting Rights Act and the John R. Lewis Voting Rights Act of New York.

### iv. Voting Rights Act Harms Affecting Plaintiffs

116.    Plaintiff Jarod Morris is a minority voter who resides and votes in Wyandanch, a hamlet located within the Town of Babylon in Suffolk County, New York. The Town of Babylon is one of many local New York jurisdictions whose local elections New York State shifted from odd-numbered years to even-numbered years with the EYEL. The EYEL applies to Plaintiff's jurisdiction beginning with the November 2025 election cycle.

117.    By consolidating local contests with federal and statewide elections, the EYEL submerges local candidates beneath racial voting patterns that do not reflect local coalitions. Minority-preferred candidates who succeed in low-salience, issue-based local elections will face reduced visibility and increased racially polarized voting, resulting in minority voters losing the ability to elect candidates of their choosing, an outcome Section 2 squarely forbids.

118.    Plaintiff Morris's Town of Babylon conducted local elections under its at-large system on odd years for more than a century. By holding odd-year elections, away from the fray of statewide and national debate, Babylon has achieved a diverse town council reflective of the community because of locally focused debate.

119.    The current Town of Babylon Council comprises two white, one Hispanic and one African American. This diversity mirrors the community, whose population is 50% white, 28% Hispanic and 14% African American. Notably, the Town of Babylon achieved this reflective diversity even though 2019-2023 5-year ACS data shows white voters comprise 61% of the Citizen Voting Age Population (CVAP).

120.    Plaintiff Morris, as a Babylon minority voter, will see the effectiveness of his vote diminished when local elections merge into even-year cycles that amplify majority bloc voting and bias.

121.    The Town of Shelter Island provides another example of an at-large electoral system leading to diverse representation.

122.    The current Town of Shelter Island Council comprises three white and one African American. Shelter Island has a diverse Council under the at-large system notwithstanding the fact that the community in Shelter Island is 87% white CVAP and only 1% African American CVAP. In fact, the African American Councilmember is also the lone Republican of the four members of the Council, elected to the position even though Shelter Island has far more Democratic registered voters (45%) than Republican registered voters (22%).

123.    Vibrant local debate works. Odd-year elections, which allow voters to evaluate the candidates and their positions on local issues rather than voting on heuristics and bias, allow these at-large electoral systems to succeed.

124.    The EYEL thus not only denies minority voters equal access to the political process but also increases the likelihood that New York's at-large systems will be subject to liability—a foreseeable and compounding consequence of the State's misguided policy choice.

125.    The EYEL will engender measurable racial disparities in down-ballot completion and candidate visibility once local contests are submerged beneath statewide and federal races, yet less discriminatory alternatives exist to increase participation in local elections without restructuring when local races occur: targeted outreach, enhanced voter information, and increased resources.

126.    In short, the EYEL transforms functioning, inclusive at-large systems into vehicles of exclusion—an outcome Congress and New York law alike forbid.

## V.
## CAUSES OF ACTION

### Count One: Violation of the First and Fourteenth Amendment Rights and Pursuant to 42 U.S.C. § 1983

127.    Plaintiffs incorporate the paragraphs above as though copied verbatim herein.

128.    The First Amendment protects the right of candidates to engage in uninhibited, robust, and wide-open political debate and the right of voters to receive information essential to informed electoral choice.[41]

129.    The EYEL imposes an unconstitutional and severe burden on those rights by suppressing local candidate speech. By mandating that county and town elections occur simultaneously with federal and statewide contests, the EYEL forces local candidates to compete for public attention, media access, and fundraising bandwidth against national races that dominate the airwaves and absorb limited civic resources.

130.    The result is not an expansion of democratic participation but a drowning-out of local voices. Under the EYEL, candidates for local office cannot meaningfully reach voters or debate local issues in their communities. Local campaigns are drowned out by federal partisanship, leaving candidates unable to disseminate their messages to voters.

131.    The principal goal of the First Amendment is not to superficially increase the number of voters that turn out to the ballot box. As the Court noted in *Anderson*, "the primary values protected by the First Amendment – a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open – are served when election campaigns are not monopolized by the existing political parties."[42]

132.    This suppression of speech is amplified by the law's tangible, practical economic burdens. As documented time and again in election studies, campaign costs rise sharply in even-year cycles, when advertising markets are saturated by national campaigns. Local candidates must pay inflated rates or forgo speech altogether. The law therefore conditions meaningful political expression on access to large sums of money, violating the core First Amendment prohibition on laws that penalize or chill speech through financial burdens.

---

[41] *Anderson*, 460 U.S. at 780.
[42] *Id* at 794.

133.    By coupling local elections to federal and statewide ballots, the EYEL systematically converts local races into low-information, partisan contests. Voters default to party heuristics and identity prejudices, rather than candidate speech. This erases the "town square" the First Amendment was designed to protect.

134.    Further, by consolidating local elections beneath high-salience federal and statewide contests, the EYEL consigns local candidates to the equivalent of "Ballot Siberia," depriving them of meaningful visibility and political opportunity and suppressing effective political speech and association.

135.    The severity of the EYEL's burden on political speech is heightened by Defendants' knowledge and intention that the law operate asymmetrically to suppress the effectiveness of local campaigns associated with the statewide minority party—here, the Republican Party. They did this by imposing a structure that predictably submerges local political speech beneath high-salience federal contests in a jurisdiction where local elections historically functioned as a critical forum for minority-party expression.

136.    The State's asserted interest in administrative efficiency or voter convenience cannot justify this wholesale suppression of speech. Even if those interests were legitimate, the EYEL is not narrowly tailored. Less-restrictive alternatives, such as state-funded voter education, could achieve the same ends without erasing the forum for local discourse.

137.    Accordingly, the EYEL unconstitutionally burdens the speech, expressive association, and petition rights of local candidates and their voters, in violation of the First Amendment.

**Count Two: Violation of Section 2 of the Federal Voting Rights Act, 52 U.S.C. § 10301**

138.    Plaintiffs incorporate the paragraphs above as though copied verbatim herein.

139.    Section 2 of the Voting Rights Act provides in part that "[n]o voting qualification or prerequisite to voting or standard, practice or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen to vote on account of race or color."[43]

140.    African Americans in New York have suffered from, and continue to suffer from, discrimination based on race. The ongoing effects of this discrimination include significant and continuing socioeconomic disparities between African Americans and whites in New York.

141.    Under the totality of the circumstances, the interaction of the New York Even Year Election Law with the effects of discrimination against African Americans in New York will cause African Americans to have less opportunity to meaningfully participate in the political process and to elect representatives of their choice.

142.    Accordingly, the New York Even Year Election Law violates Section 2 of the Voting Rights Act.

**Count Three: Injunctive Relief**

143.    Plaintiffs incorporate the paragraphs above as though copied verbatim herein.

144.    As alleged in Counts One and Two, the EYEL violates the First Amendment and Section 2 of the Voting Rights Act.

145.    Under *Ex parte Young*, 209 U.S. 123 (1908), and the Supremacy Clause, U.S. Const. art. VI, cl. 2, federal courts may enjoin state officials from enforcing or compelling compliance with state laws that conflict with federal constitutional and statutory guarantees.

146.    Absent injunctive relief, all Plaintiffs will suffer irreparable harm.

147.    Candidate Plaintiffs will be forced to campaign and appear on ballots in an environment that suppresses their political speech, distorts their messages, and materially burdens their ability to associate with voters.

---

[43] 52 U.S.C. § 10301(a).

148.    Voter Plaintiff will face elections conducted under a regime that predictably increases down-ballot roll-off, exacerbates racially polarized voting, and diminishes his equal opportunity to participate and elect representatives of his choice.

149.    Party Plaintiffs will have their expressive and associational activities impaired, including recruiting, endorsing, supporting, and communicating with respect to local candidates and issues.

150.    Municipal Plaintiffs will be compelled to plan, administer, and conduct elections pursuant to an unlawful regime that infringes on the rights of their citizens.

151.    These injuries are concrete, particularized, and imminent.

152.    Enjoining the enforcement and compelled implementation of the EYEL safeguards the federal constitutional and statutory rights of candidates, voters, political parties, and local governments.

## VI.
## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief against Defendants:

- Declare that the EYEL violates the First Amendment to the United States Constitution by impermissibly burdening and suppressing political speech, association, and petition in local elections;

- Declare that the EYEL violates Section 2 of the Voting Rights Act of 1965, 52 U.S.C. § 10301;

- Enjoin Defendants from enforcing, implementing, or giving any effect to the EYEL until further orders of this Court;

- Order that localities subject to the EYEL be given an opportunity to opt-out according to a procedure ordered by this Court;

- Award Plaintiffs their reasonable attorneys' fees, expert witness fees, and costs of litigation pursuant to 42 U.S.C. § 1988(b) and 52 U.S.C. § 10310(e); and

- Grant such other and further relief as the Court deems just and proper.

Dated: December 29, 2025                    Respectfully submitted,

**BREWER, ATTORNEYS & COUNSELORS**

/s/ *William A. Brewer III*
William A. Brewer III
750 Lexington Avenue
New York, NY 10022
Tel: 212-489-1400
wab@brewerattorneys.com

***COUNSEL FOR PLAINTIFFS***